IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **MICHAEL DALE RIMMER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 3:10-1106 |
| ) | Judge Trauger |
| **ERIC HOLDER, in his official capacity as** ) | |
| **Attorney General, UNITED STATES** ) | |
| **DEPARTMENT OF JUSTICE, FEDERAL** ) | |
| **BUREAU OF INVESTIGATION, and** ) | |
| **ROBERT S. MUELLER, III, in his official** ) | |
| **capacity as Director (FBI),** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment on Plaintiff's Claim under the Freedom of Information Act ("FOIA") (Docket No. 27), to which the plaintiff has responded (Docket No. 35), and the defendants have filed a reply in support (Docket No. 36). For the reasons discussed herein, the defendants' motion will be granted, and this case will be dismissed.

## BACKGROUND

The plaintiff, Michael Dale Rimmer, is presently incarcerated at Riverbend Maximum Security Correctional Institution in Nashville, Tennessee.[1] On February 8, 1997, Ricci Lynn

---

[1]The background of the underlying criminal activity and related legal proceedings was provided in the court's August 15, 2011 Memorandum and is re-stated herein. (Docket No. 31.) Otherwise, the facts are drawn from the defendants' Statement of Undisputed Material Facts (Docket No. 30), to which the plaintiff did not respond. On a motion for summary judgment, all

1

Ellsworth, a clerk at the Memphis Inn in Memphis, Tennessee, went missing, and her body has never been recovered. It was clear to officers called to the Memphis Inn that night, however, that a violent struggle had taken place at the Memphis Inn and that Ellsworth likely sustained injuries resulting in her death at the Memphis Inn before she was found to be missing.

On February 11, 1997, Memphis police contacted the FBI Safe Streets Task Force (SSTF), which was a conglomeration of federal and state law enforcement agencies, for assistance in investigating Ellsworth's disappearance. By February 18, 1997, the FBI had opened a file on the apparent kidnapping and murder of Ellsworth. On February 20, 1997, the Memphis FBI office sent a memo to the Director of the FBI, stating that a witness (now known to be an individual named James Darnell) had come forward and informed the FBI that he had seen two white males in the motel office between 1:30 a.m. and 2:30 a.m. on the night that Ellsworth disappeared. Darnell told the FBI that one man was inside the "closed clerk's cage" (where Ellsworth normally was working), taking money from the cash register and handing it to the other man, who was standing near the front door by the rear of a vehicle, which was backed up to the motel door with its trunk opened. Darnell told federal investigators that both men – neither of whom resemble the plaintiff – had blood on their hands.

On April 3, 1997, the Memphis FBI office sent the Honolulu FBI office a memo, photographic lineups, and pictures of a car that the FBI believed may have been the one backed

---

inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Here, however, the material facts are not in dispute; rather, the only issue is the legal applicability of several FOIA exemptions, as discussed herein.

up to the motel door. Darnell was in Hawaii, and the Honolulu branch was tasked with interviewing him to see if he could make identifications of potential perpetrators from the lineups. Rimmer's picture was included in the photo lineups, as, early on in the investigation, he emerged as a prime suspect in Ellsworth's disappearance.

On May 21, 1997, Darnell was interviewed and shown several photo lineups, including pictures of Rimmer. He identified one individual – Billy Wayne Voyles – from the lineup as having been one of the bloodied men in the motel lobby; he did not identify Rimmer. Voyles had an outstanding warrant related to attempted murder and robbery charges. The interview and lineup results were sent back to the SSTF in Memphis on May 22, 1997. On June 21, 1997, Darnell (still in Hawaii) was again shown the lineup, and he again identified Voyles and not Rimmer.[2]

The plaintiff alleges that the results of this second lineup were also sent back to the Memphis SSTF office, and the Memphis FBI office, the Memphis SSTF, the Shelby County District Attorney's office, and Memphis police officials continued a joint investigation of the Ellsworth disappearance and apparent murder through the summer and fall of 1997, in anticipation of a federal and state prosecution of the plaintiff, who had emerged as the lone suspect. Indeed, documents uncovered by the plaintiff indicate that the federal authorities conducted lab work/evidence examination in the case and had prepared grand jury subpoenas, which were ultimately cancelled, as the federal authorities were unable to make arrangements for

---

[2]The plaintiff alleges that "Voyles was abandoned as a suspect after providing an alibi which was not investigated." (Docket No. 1 at 3.)

the transportation of certain inmate witnesses.

In January 1998, the plaintiff was indicted on state murder and robbery charges related to Ellsworth's disappearance. In November 1998, he was convicted and sentenced to death. After learning that the plaintiff had been sentenced to death in state court, the U.S. Attorney declined further prosecution, and the federal case was closed. On appeal from the state court conviction, the plaintiff's death sentence was reversed, and the case was remanded for a new sentencing trial. At the 2004 trial, Rimmer was once again sentenced to death. The Tennessee Supreme Court upheld this death sentence in 2008. In October 2008, the plaintiff filed a petition for post-conviction relief in the Shelby County Criminal Court, and he was appointed counsel for these collateral review proceedings on December 16, 2008.

The plaintiff alleges that, in preparing for the collateral review proceedings, he "discovered for the first time that the federal government had conducted [the] joint investigation [discussed above] with the Memphis police and the Shelby County District Attorney." (Docket No. 1 at 1.) That is, it was not until this stage in the proceedings that, through "independent investigation," the plaintiff learned, among other things, of Darnell's identification of Voyles. (*Id*. at 12.) Indeed, the plaintiff claims that the lead investigator in the case gave false testimony at trial when he testified that Darnell had not identified anyone from the photo lineups.

Since learning of the federal investigation, the plaintiff has attempted (1) to have the District Attorney's office disqualified from the collateral review proceedings and (2) to obtain the complete FBI record "regarding the disappearance of Ricci Lynn Ellsworth on February 8, 1997." (*Id.* at 11.) The plaintiff's efforts to have the District Attorney's office disqualified

4

continue at the state court level, as does his collateral review proceeding, which raises *Brady* claims. The efforts to obtain the FBI records have resulted in this lawsuit.

On April 7, 2009, the plaintiff submitted FOIA requests to the FBI field offices in Memphis, Honolulu and Washington, DC, seeking "any and all records, documents, or materials pertaining to Michael Dale Rimmer, Billy Wayne Voyles, James Millen Darnell, Jr., and Ricci Lynn Morrison Ellsworth." (Docket No. 30 at 1.) Later that month, the FBI acknowledged receipt of the FOIA requests and initiated a search of the FBI Central Records System at the Memphis field office for records related to the plaintiff. The FBI informed the plaintiff that, under FOIA, it would not be able to initiate searches for records related to the other individuals until it received proof of death or a privacy waiver, given the nature of the information sought.

On June 12, 2009, the FBI informed the plaintiff that it had identified and processed 616 pages responsive to his request for records related to himself.[3] The FBI released only 62 pages in full and 127 in part, withholding the remainder of the materials based on a variety of FOIA exemptions and bureaucratic explanations. On August 7, 2009, the plaintiff submitted his appeal to the Department of Justice's Office of Information Policy, which, on September 28, 2009, affirmed the FBI's June 12, 2009 response to the plaintiff's request.

On November 19, 2010, the plaintiff filed this lawsuit against the U.S. Attorney General, the Department of Justice, and the FBI, asserting claims under the Administrative Procedure Act

---

[3]On July 7, 2009, the plaintiff provided proof of Ellsworth's death and requested access to her records. On August 10, 2009, the FBI informed the plaintiff that a search for Ellsworth's records had not revealed any more information then that which was already disclosed. No further action was apparently taken to obtain Volyes's and Darnell's records.

(APA) and for mandamus relief.[4] (*See* Docket No. 1.) On January 18, 2011, the plaintiff amended his Complaint to add a claim under FOIA. (Docket No. 15.) The plaintiff maintains that the defendants have a duty to protect his constitutional rights, and he seeks an order from the court compelling the federal authorities to "produce the documents sought, and release them to plaintiff." (Docket No. 1 at 22; Docket No. 15.) As alternative relief under FOIA, the plaintiff requested an *in camera* review by the court to determine the validity of any defense objections to production. (Docket No. 15 at 2.)

Negotiations between the parties following the filing of this lawsuit clarified (upward) the size of the relevant file and (downward) the potentially applicable FOIA exemptions. The FBI now maintains that the size of the plaintiff's file is 786 pages. On April 1, 2011, the FBI released this 786-page file to the plaintiff, with 82 pages released in full and 704 pages released in part. The FBI also provided assurances that, in light of some duplication of documents within the file, all pages had been processed consistently. It is the court's understanding from previous discussions with the parties that the redacted pages released to the plaintiff indicated the FOIA exemption that justified each redaction.

Following further negotiations between the parties, dispute over the applicability of the defendants' claimed FOIA exemptions remained as to 539 pages of the file. After discussions between the parties and the court, on August 12, 2011, the defendants filed the 539 pages with the court for an *in camera* review. The defendants' submission allowed the court to "see

---

[4]These claims were dismissed in the court's August 15, 2011 Memorandum and Order. (Docket Nos. 31-32.)

through" each redaction on a given page and to see the claimed FOIA exemption for that redaction. That same day, the defendants filed a Motion for Summary Judgment, arguing that the FOIA exemptions were properly claimed, and, in light of the fact that the defendants had met their obligations under FOIA and disclosed all allowable material to the plaintiff, this case should be dismissed. (Docket No. 27.)

## ANALYSIS

I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving party shows that there is no genuine issue of material fact on the essential elements of the claim, then the burden shifts to the non-moving party to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the non-moving party's

7

proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**II.     The Motion for Summary Judgment**

    **A.     Applicable Law**

The "fundamental principle" of FOIA is "public access to Government documents." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). However, courts interpreting FOIA recognize that Congress desired to strike a "balance . . . between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't. of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003). This latter interest is protected by nine FOIA exemptions listed in Section 552(b) of the Act. 5 U.S.C. § 552(b). These exemptions are to be "narrowly," but meaningfully, construed to serve the dual interests at play. *See John Doe Agency*, 493 U.S. at 152; *FBI v. Abramson*, 456 U.S. 615, 621 (1982). Further, "any reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

Given that they normally involve purely legal questions, FOIA actions tend to be resolved at the summary judgment stage. *Reliant Energy Power Generations v. FERC*, 520 F. Supp.2d 194, 200 (D.D.C. 2007). To prevail, the Government entity must show that it made a "good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information" and that the withheld materials fall within a FOIA statutory exemption. *CareToLove v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011); *Rugiero v.*

*U.S. Dept of Justice*, 257 F.3d 534, 543 (6th Cir. 2001). An agency's denial of a FOIA request is reviewed *de novo* by the district court. *Id.*

The plaintiff does not challenge the adequacy of the defendants' search and, through the declaration of David Hardy, a "Section Chief" within the "Records Management Division" of the FBI, the defendants provide a lengthy description of the FBI's Central Records System and of the extensive search parameters used to undercover records related to the plaintiff and Ellsworth. (Docket No. 29 at 6-12.) There appears to be no dispute, then, that the defendants met the requirement to search in "good faith" and, therefore, the court's analysis will focus on the applicability of the FOIA exemptions.

The defendants rely on FOIA exemptions, 6, 7(C), and 7(D). (Docket No. 28 at 6.) Exemption 6 states that the agency's FOIA disclosure obligations do not extend to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7 applies to certain "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Specifically, Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). And, Exemption 7(D) protects from disclosure information in such records that "could reasonably be expected to disclose the identity of a confidential source," along with "information furnished by a confidential source" during a criminal investigation. 5 U.S.C. § 552(b)(7)(D).

Because all of the redacted records were compiled for law enforcement purposes, and

9

because Exemption 7(C) provides broader privacy protections than Exemption 6, the court can resolve this motion by largely focusing on Exemption 7(C).[5] In considering the propriety of a 7(C) Exemption, the agency or the court is to conduct a balancing test, which weighs the privacy interests that would be compromised against the *public* interest in disclosure. *U.S. Dept. of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762 (1989). Because, in the Exemption 7(C) context, the information at issue was "compiled through the power of the state," private information contained in such files should only be disclosed where the requester shows that the disclosure seeks to advance a "significant" public interest and that the disclosure will "likely" actually advance that interest. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

Here, the FBI viewed the threat to personal privacy as stemming primarily from the potential release of names and/or "identifying information" of eight categories of individuals, that is, "(1)FBI special agents and support personnel; (2) third parties who provided information to law enforcement; (3) state or local law enforcement personnel; (4) third parties merely mentioned; (5) third parties with criminal records/rap sheets; (6) third parties of investigative

---

[5]The plaintiff provides little challenge to the defendants' relatively few invocations of Exemption 7(D) to justify certain redactions. The plaintiff's primary argument is that, through other investigation, he has become aware of the names of the individuals that the defendants seek to protect through redaction, along with some of the information that they provided, and that most of this information is contained in state law enforcement files that should have been disclosed at the time of his trial. (Docket No. 34 at 7-8.) It is well settled, however, that the identity of confidential informants and the information they provide is to be protected under FOIA, even if "a confidential source is later revealed." *Rugiero*, 257 F.3d at 551. Further, as discussed below, the purposes and goals of FOIA and litigation discovery are entirely separate, and FOIA does not operate as a substitute for the discovery process or as a tool to remedy past discovery abuses. *Id.* at 547.

interest; (7) non-FBI federal government personnel; and (8) third party victims." (Docket No. 28 at 9.) The defendants' suggestion that it is an "invasion of personal privacy" to release to the public the names and identifying information of those involved in law enforcement investigations is well supported by the case law. *Kiraly v. FBI*, 728 F.2d 273, 277 (6th Cir. 1984)("people who were investigated for suspected criminal activity or who were otherwise mentioned therein, but who were not indicted or tried . . . could [be] subject to embarrassment, harassment, and even physical danger")[6]

Consistent with this, Hardy's declaration states that, for private citizens caught up in the investigation, having one's name or identifying information linked to such an investigation "carries an extremely negative connotation" and could reasonably be expected to cause harassment or criticism" particularly, as Hardy points out, given that Rimmer attacked one of the

---

[6]*See also Gavin v. U.S. S.E.C.*, 2007 WL 2454156, *11 (D. Minn. Aug. 23, 2007)( "Exemption 7(C) authorizes nondisclosure of staff names, as well as information in law enforcement investigation files that identify third parties."); *Kuehnert v. FBI*, 620 F. 2d 662, 667 (8th Cir. 1980)("The FBI deleted the names of, and information concerning, third parties mentioned in the records under exemption 7(C). In all but two instances these individuals were asserted to be 'of investigative interest' to the FBI. Given the unwarranted invasion of personal privacy that would accompany disclosure of the identity of these individuals, we hold that the FBI properly withheld this information."); *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990)(persons involved in law enforcement investigations – "even if they are not the subject of the investigation-have a substantial interest in seeing that their participation remains secret") (internal quotations and citations omitted); *Sussman v. U.S. Marshal's Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007)("Names of private individuals are thus generally exempt from disclosure except, for example, where they are required to confirm or refute allegations of improper government activity."); *Roth v. U.S. Dept. of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)("we have thus held that not only the targets of law-enforcement investigations, but also witnesses, informants, and investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret.")(internal quotations omitted).

11

state's trial witnesses while in prison. (Docket No. 29 at 23.). Moreover, Hardy states, releasing the names and/or identifying information of those who provided information to law enforcement would create a chilling effect on those who would be inclined to provide information to law enforcement in the future. (*Id.* at 21.) Further, the defendants argue, law enforcement officials identified in connection with this case might be subject to "unnecessary" and unwarranted questioning or become the target of a member of the public with an "ax to grind." (*Id.* at 19.)

These risks must be balanced against the "countervailing public benefit" in disclosure. *Kiraly*, 728 F.2d at 277. The defendants argue that the only conceivable potential *public* benefit stemming from the release of this information is that it would "shed[] light on the activities and operations of the federal government." (Docket No. 28 at 9.) The defendants maintain that the public knowing the names or being able to identify those individuals involved in the investigation of this case would not shed any light on the "activities and operations of the federal government" and would not serve the public interest. Therefore, on balance, this information should not be disclosed. (*Id.* at 10.)

In response, the plaintiff maintains that he has no interest in harassing the law enforcement officials identified in the documents; rather his interest is "in investigating and presenting in state court exculpatory evidence developed by the state and federal government," in order to avoid his death sentence. (Docket No. 34 at 6.) The plaintiff contends that his independent investigation has uncovered "most, if not all, of the state law enforcement officers involved in [the] case," along with the names of the U.S. Attorneys involved, but he needs the complete records to confirm the scope of each individual's involvement and in order to "fully

investigate." (*Id*. at 6-7.)

The plaintiff also suggests that the public has considerable interest in seeing this information disclosed, because it is in the public interest to know whether the "FBI might be withholding information that could corroborate a death row inmate's claim of innocence." (*Id*. at 9 quoting *Roth v. U.S. Dept. of Justice*, 642 F.3d 1161, 1176 (D.C. Cir. 2011)).[7] The plaintiff also claims that the equities in this case "militate in favor of fuller disclosure given the unique circumstances of the case," which include that the federal government took a key role in the investigation, false testimony was presented at trial, the plaintiff should have received much of this information – unredacted – in pre-trial discovery at his initial trial, the plaintiff's fundamental constitutional rights are implicated by any improper conviction, and that the attorneys who prosecuted this case initially acted unethically. (Docket No. 35 at 8-9.)

As indicated above, the first "countervailing public benefit" identified by the plaintiff,

---

[7]Indeed, the plaintiff relies heavily on *Roth* and *Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994), cases in which the court found that the Government's response to a FOIA request on behalf of a prisoner seeking to gain information into the investigation that led to his conviction was not consistent with the openness dictated by the statute. Neither case, however, is particularly helpful here. In *Jones*, the court rejected the Government's efforts to rely on affidavits to justify the applicability of exemptions, ruling that, while such affidavits are normally entitled to a presumption of good faith, they are not so entitled when the underlying investigation involved bad faith. 41 F.3d at 242-43. Here, the Government is not relying on affidavits alone to justify the exemptions but has submitted the documents for an *in camera* review, allowing the court to determine the applicability of the exemptions and negating an analysis that would consider whether the presumption of good faith applied. It is true that, in *Roth*, the court stated that a death sentence "strengthened the public's interest in knowing whether the FBI's files contain information that could corroborate an innocence claim." 642 F.3d at 1176. But, again, the plaintiff ignores the context in which the statement was made. In *Roth*, the FBI had not submitted the documents for an *in camera* review but had, in response to the FOIA request, refused to confirm or deny the existence of responsive records, a practice that the court rejected in light of the stakes of the case. *Id*. at 1184.

13

that the unredacted production would be a tool to aid him in his underlying state collateral review proceedings, is an illegitimate one. The purposes of civil discovery (which aids the litigant) and FOIA (which aids the public at large) are clearly distinct, and FOIA does not serve as a "substitute for the normal process of discovery in civil and criminal cases." *Rugiero*, 257 F.3d at 547; *Jones*, 41 F.3d at 250. ("FOIA was intended as a sunshine measure to bring agency operations to public knowledge within specified limits, not as the primary vehicle for prosecuting agency misbehavior" through civil actions); *see also Stonehill v. IRS*, 558 F.3d 534, 538 (D.C. Cir. 2009)("The FOIA disclosure regime . . . is distinct from civil discovery . . . while information disclosed during discovery is limited to the parties and can be subject to protective orders against further disclosure, when a document must be disclosed under FOIA, it must be disclosed to the general public.")

While there is undoubtedly a public interest in shedding light on how the federal agencies operate and whether they could work to imprison someone illegitimately, the specific information being withheld does not shed light on how the FBI works or if the FBI is engaged in conduct that might have resulted in an innocent man being sentenced to death.[8] Rather, the

---

[8]Indeed, the court believes that there is a strong public interest in ensuring that the Government complies with its constitutional obligations, including *Brady* obligations, and in ensuring that false testimony is not offered at trial, especially in capital cases. That said, it must be emphasized that the *redacted* material at issue does not bear on those public interests. Again, what is redacted is names and identifying information, primarily of those who provided information to the police during the underlying investigation. The Government is not, for instance, attempting to withhold material that indicates which documents were (or were not) timely disclosed to the defendant or that indicates that a witness perjured himself at trial. In short, the plaintiff has identified strong public interests, but he has not connected those interests to the material actually redacted.

14

information being withheld is, by and large, the names and identifying information of people who happened to be involved in the investigation. This information, as the Supreme Court has recognized, does not generally assist the public in determining whether the agency is performing its duties properly. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 772 ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within th[e] statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct.")(internal quotation omitted).

The bottom line is that the defendants are entirely correct that the "public interest in learning [] personal details" of those involved in the investigation is "negligible." (Docket No. 36 at 2.) This negligible interest is weighed against the recognized privacy interests at issue, and it is clear that the defendants are properly redacting names and identifying information of those connected with the law enforcement investigation.

The court has reviewed the materials filed *in camera* and concludes that, in the vast majority of cases, it is clear that the redaction has made secret the name or other identifying information (such as an address, phone number, date of birth, social security number, or place of employment) of someone involved in this investigation. Therefore, the court has "no issue" with the vast majority of the redactions, in light of the analysis above.

There are a handful of places in the record where, again citing Exemption 7(C), the defendants have redacted portions (from a few sentences to a few paragraphs) of an interview or statement that an individual gave to authorities that does not provide information that is facially

"identifying." (*See e.g.* RIMMER 58-62, RIMMER 284, RIMMER 297-304, RIMMER 541.) The court presumes that the defendants are being extremely "careful" to redact information that could, if certain connections between individuals were made, arguably be used to identify particular individuals who provided information to law enforcement that was damaging to the plaintiff. The court has carefully considered these redactions and, concludes that, given the challenges posed by the "reasonable segregability" standard, the heightened privacy protections that are owed to these individuals who willingly provide potentially incriminating information to law enforcement and the fact that none of the information redacted sheds light on how the Government entity actually performs its functions or suggests that the government agency has been involved in imprisoning an innocent individual, the redactions are not inappropriate.

Therefore, the court concludes that, in releasing the redacted file to the plaintiff, the defendants have met their obligations under FOIA, and, therefore, this case should be dismissed.

## CONCLUSION

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be granted, and this case will be dismissed.

An appropriate Order will enter.

ALETA A. TRAUGER
U.S. District Court Judge